**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| PHILLIS MCADAMS, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-07-1021 |
| | § | |
| MICHAEL J. ASTRUE, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant*. | § | |

**MEMORANDUM AND ORDER**

Pending before the court are Plaintiff Phillis McAdams' ("McAdams") and Defendant Michael J. Astrue's, Commissioner of the Social Security Administration ("the Commissioner"), cross-motions for summary judgment. McAdams appeals the determination of an Administrative Law Judge ("the ALJ") that she is not entitled to receive Title II disability insurance benefits or Title XVI supplemental security income ("SSI") benefits. *See* 42 U.S.C. §§ 416(i), 423, 1382c(a)(3)(A). Having reviewed the pending motions, the submissions of the parties, the pleadings, the administrative record, and the applicable law, this Court is of the opinion that McAdams' Motion for Summary Judgment (Docket Entry No. 19) should be denied, the Commissioner's Motion for Summary Judgment (Docket Entry No. 20) should be granted, and that the Commissioner's decision denying benefits be affirmed.

**I.    _Background_**

On May 27, 2003, McAdams filed an applications for disability insurance benefits and SSI benefits with the Social Security Administration ("SSA"), alleging disability beginning on February 27, 2001. (R. 76-78, 669-671). McAdams alleged that she suffers from chronic lower back pain, a seizure disorder, and depression. (R. 90, 668). After being denied benefits initially and on

reconsideration (R. 40, 41, 50, 51-55, 672, 680), McAdams requested an administrative hearing before an ALJ to review the decision.  (R. 56).

A hearing was held on December 22, 2004, in Houston, Texas, at which time the ALJ heard testimony from McAdams, and Patricia Cowen ("Cowen"), a vocational expert ("VE").  (R. 27, 686-717).  In a decision dated March 25, 2005, the ALJ denied McAdams' applications for benefits.  (R. 27-35).  On April 1, 2005, McAdams appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals.  (R. 23).  The Appeals Council denied McAdams' request to review the ALJ's determination.  (R. 5-7).  This rendered the ALJ's opinion the final decision of the Commissioner.  *See Sims v. Apfel,* 530 U.S. 103, 107 (2000).  McAdams filed this case on March 26, 2007, seeking judicial review of the Commissioner's denial of her claim for benefits.  *See* Docket Entry No. 1.

**II.**     *Analysis*

     **A.**     *Statutory Bases for Benefits*

SSI benefits are authorized by Title XVI of the Act and are funded by general tax revenues. *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001). The SSI Program is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line.  *See* 20 C.F.R. § 416.110.  Eligibility for SSI is based upon proof of *indigence* and *disability*.  *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C).  A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which she applies for benefits, no matter how long she has actually been disabled.  *See Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); *see also* 20 C.F.R. § 416.335.  The applicable regulation provides:

> When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application.  If you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month.

20 C.F.R. § 416.335.  Thus, the month following an application, here, June 27, 2003, fixes the earliest date from which benefits can be paid.  Eligibility for SSI payments, however, is not dependent on insured status.  *See* 42 U.S.C. § 1382(a).

Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes.  *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001).  The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence.  A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application.  *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger*, 516 F.2d 1005, 1007 n.1 (5th Cir. 1975); *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997).  For purposes of Title II disability benefits, McAdams was insured for benefits through December 31, 2004.  (R. 34).  Consequently, to be eligible for disability benefits, McAdams must prove that she was disabled prior to that date.

Applicants seeking benefits under this statutory provision must prove "disability" within the meaning of the Act.  See 42 U.S.C. § 423(d); 20 C.F.R. § 404.1505(a).  Under Title II, disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

While these are separate and distinct programs, applicants seeking benefits under either statutory provision must prove 'disability' within the meaning of the Act, which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). Under both provisions, disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A). Moreover, "the law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995).

B.    ***Standard of Review***

1.    ***Summary Judgment***

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case. If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991). When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's

4

position.  *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000).  If there are no issues of material fact, the court shall review any questions of law *de novo*.  *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

### 2.  *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence.  *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).  "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present."  *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002).  Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision.  *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).  The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its

5

judgment for that of the Commissioner.  *See Masterson*, 309 F.3d at 272.  In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve."  *Masterson*, 309 F.3d at 272.

**C.**    ***ALJ's Determination***

An ALJ must engage in a five-step inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2.    An individual who does not have a "severe impairment" will not be found to be disabled.  *See* 20 C.F.R. §§ 404.2520(c), 416.920(c).

3.    An individual who "meets or equals a listed impairment in Appendix 1"of the regulations will be considered disabled without consideration of vocational factors.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4.    If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made.  *See* C.F.R. §§ 404.1520(e), 416.920(e).

5.    If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 705.  The claimant has the burden to prove disability under the first four steps.  *See Myers*, 238 F.3d at 619.  If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  *See Masterson*, 309 F.3d at 272; *Greenspan v. Shalala*, 38 F.3d 232, 236.  If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of her existing impairments, the burden shifts back

to the claimant to prove that she cannot, in fact, perform the alternate work suggested. *See Boyd*, 239 F.3d at 705. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See id*.

The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992). An individual claiming disability benefits under the Act has the burden to prove that she suffers from a disability as defined by the Act. *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). A claimant is deemed disabled under the Act only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity is defined as work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. §§ 404.1572(a), (b), 416.972.

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.'" *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (quoting 42 U.S.C. § 423(d)(3)). "[A]n individual is 'under a disability, only if [her] impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of

7

substantial gainful work which exists in the national economy . . . .'"  *Greenspan*, 38 F.3d at 236

(quoting 42 U.S.C. § 423(d)(2)(A)).  This is true regardless of whether such work exists in the

immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the

claimant would be hired if she applied.  *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir.

1981); *see also* 42 U.S.C. § 423(d)(2)(A).

  In the case at bar, when addressing the first four steps the ALJ determined:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through December 31, 2004.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's back pain, depression, and seizure disorder are considered "severe" based on the requirements in the Regulations 20 C.F.R. §§ 404.1520(c) and 416,920(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reason set forth in the body of the decision.

6. The claimant has the following residual functional capacity to perform a range of light work.  Specifically, the undersigned finds that the claimant can occasionally climb, balance, stoop, kneel, crouch or crawl.  She can not perform jobs at unprotected heights or in the presence of hazardous machinery or equipment.  In addressing the claimant's mental impairment, she must not perform jobs that require detailed work, none requiring sustained concentration and attention or persistence and pace for prolonged periods and, she can only have occasional interaction with the general public.

7. The claimant is unable to perform any of her past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(R. 34-35).  As to the fifth step, the ALJ concluded:

8.      On the alleged onset date, the claimant was a "younger individual between the ages of 45 and 49" (20 C.F.R. §§ 404.1563 and 416.963).

9.      The claimant has "a limited education" (20 C.F.R. §§ 404.1564 and 416.964).

10.     The claimant has no transferable skills from any past relevant work (20 C.F.R. §§ 404.1568 and 416.968).

11.     The claimant has the residual functional capacity to perform a range of light work (20 C.F.R. §§ 404.1567 and 416.967).

12.     Based on an exertional capacity for light work, and the claimant's age, education, and work experience, Medical-Vocational Rule 202.18, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

13.     The claimant's capacity for light work is substantially intact and has not been compromised by any nonexertional limitations.   Accordingly, using the above-cited rule(s) as a framework for decision-making, the claimant is not disabled.

14.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

(R. 35).

This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied.  *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3).  To determine whether the decision to deny McAdams' claim for disability benefits is supported by substantial evidence, the court weighs the following four factors:  (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the plaintiff's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the plaintiff's age, educational background, and work history. *See Martinez v. Chater*, 64 F.3d 172, 174

(5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)).  Any conflicts in the evidence are to be resolved by the ALJ, and not the Court.  *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

   **D.**  **_Issues Presented_**

   McAdams contends that the ALJ committed error in finding that McAdams retained the ability to perform a limited range of light work.  *See* Docket Entry No. 19, at 6.  McAdams also argues that the ALJ erred by failing to properly evaluate McAdams' credibility.  *See* Docket Entry No. 19, at 11.  McAdams further asserts that the ALJ erred in finding that McAdams retains the ability to perform other work existing in significant numbers in the national economy.  *See* Docket Entry No. 19, at 13.  The Commissioner disagrees with McAdams' contentions, maintaining that the ALJ's decision is supported by substantial evidence.  *See* Docket Entry No. 20.

   **E.**  **_Review of the ALJ's Decision_**

   **1.**  **_Objective Medical Evidence and Opinions of Physicians_**

   When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work."  *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990).  If the claimant is not actually working and her impairments match or are equivalent to one of the listed impairments, she is presumed to be disabled and qualifies for benefits without further inquiry.  *See id.* at 532; *see also* 20 C.F.R. § 416.920(d).  When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."  42 U.S.C.

§ 423(d)(2)(B); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).  The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.  If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. §§ 404.1523, 416.923; *see also Loza*, 219 F.3d at 393.  The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment.  *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that her impairment or combination of impairments is equivalent to or greater than a listed impairment.  *See id.* at 530-31; *Selders*, 914 F.2d at 619.  The listings describe a variety of physical and mental illnesses and abnormalities, and are typically categorized by the body system they affect.  *See Zebley*, 493 U.S. at 529-30.  Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results.  *See id.* at 530.  For a claimant to demonstrate that her disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria.  *See id.*  An impairment, no matter how severe, does not qualify if that impairment manifests only some of the specified criteria.  *See id.*

For a claimant to qualify for benefits by showing that her unlisted impairment, or combination of impairments, is equivalent to a listed impairment, she must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.  *See id.* at 531 (citing 20 C.F.R. § 416.926(a)).  A claimant's disability is equivalent to a listed impairment if the medical

findings are at least equal in severity and duration to the listed findings.  *See* 20 C.F.R. §§ 404.1526(a), 416.926(a).  The applicable regulations further provide:

>   (1)(i)   If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—
>
>>   (A)   You do not exhibit one or more of the medical findings specified in the particular listing, or
>>
>>   (B)   You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;
>
>   (ii)   We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

20 C.F.R. §§ 404.1526(a), 416.926(a).  Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment."  *Zebley*, 493 U.S. at 531. Ultimately, the question of equivalence is an issue reserved for the Commissioner.  *See Spellman v. Shalala*, 1 F.3d 357 (5th Cir. 1993); 20 C.F.R. §§ 404.1527(e), 416.927(e).

A review of the medical records submitted in connection with McAdams' administrative hearing reveals a history of hospitalization for substance abuse and seizures.  (R. 142-146, 148, 150,-152, 156-157, 237-238, 246).  On January 5, 2001, at approximately 6:49 p.m., McAdams was hospitalized due to an intentional drug overdose.  (R. 142-146).  She admitted to taking Soma, Xanax, Trazadone, and Ativan.  (R. 144).  She was discharged on January 6, 2001, around 12:15 p.m.  (R. 143).

On June 11, 2001, McAdams was admitted to Northeast Medical Center Hospital due to back pain she experienced after she fell during a seizure.  (R. 148-149, 156-157, 237-238, 246).  During her assessment in the emergency room with Daniel O'Connor, M.D. ("Dr. O'Connor"), McAdams

12

explained that she had a history of abusing Xanax, and had experienced Xanax-withdrawal seizures in the past.  (R. 150).  Dr. O'Connor noted that McAdams was awake and oriented during the examination, and was following commands with good comprehension.  (R. 152).  After reviewing x-ray results of her lumbar spine, Dr. O'Connor noted that there was a probable acute L-2 compression fracture.  (R. 152).  McAdams also met with George A. Brooks, M.D., Ph.D., P.A. ("Dr. Brooks").  Upon physical examination, Dr. Brooks reported that McAdams' extremities were distally warm with no edema; her neurological examination was grossly intact.  (R. 156).  Dr. Brooks noted that the drug screen test was positive for Benzodiazepine.  (R. 156).  Dr. Brooks recommended that the treatment plan was to admit McAdams to the hospital for pain reduction therapy and for evaluation for treatment of her seizure disorder.  (R. 157).

On June 12, 2001, McAdams had a consultation with neurologist Massoud Bina, M.D. ("Dr. Bina"), for treatment of her seizure disorder.  (R. 158-159).  Upon physical examination, Dr. Bina reported that she was awake, alert, and had fluent speech.  (R. 158).  Her mental status was noted as "normal."  (R. 158).  Dr. Bina noted deep tendon reflexes, motor, sensory, gait, and cerebellar tests were intact.  (R. 158).  Dr. Bina diagnosed McAdams with seizure disorder, cause unknown, possibly due to abuse of medications or possibly withdrawal to medications.  (R. 158).  Dr. Bina recommended that McAdams be treated with anti-epileptic medication (*i.e.*, Dilantin).  (R. 158). Dr. Bina further noted that McAdams needed to be treated for her drug abuse through rehabilitation and her family doctor.  (R. 158).  A whole body bone scan performed the same day revealed unremarkable results.  (R. 176).

One June 13, 2001, McAdams had a consultation with Leonardo A. Palau, M.D. ("Dr. Palau), who noted that she was awake, alert, oriented, and in no distress whatsoever.  (R. 162, 244).  Dr.

13

Palau additionally stated that he could not tell whether McAdams was reliable or not.  (R. 162, 244).  On the same day, an electroencephalogram report revealed that there was a presence of possible epileptiform activity in the frontotemporal area, but that a repeat electroencephalogram ("EEG") would have to be performed when the patient was more cooperative to be sure of the results.  (R. 164, 250).  Further, a radiology report revealed the interval development of atelectasis.  (R. 175).

On June 15, 2001, McAdams had a psychiatric consultation while at Northeast Medical Center Hospital.  (R. 160-161).  At the time the examiner, who's signature is illegible, entered McAdams' room, she was in four point restraints.  (R. 160).  The examiner noted that McAdams was screaming during the interview about "Entex" and "gas blowing all over the place."  (R. 160).  The examiner further noted that McAdams was experiencing auditory, visual, and olfactory hallucinations.  (R. 160).  During the session, McAdams admitted to taking 5-6 Xanax tablets of 0.5 to 1 mg each per day plus numerous Soma tablets.  (R. 160).  The examiner reported that McAdams did not know the correct President of the United States, the capital of Texas, or the date.  (R. 160).  McAdams also refused to perform some of the tasks asked of her, and answered the examiner's questions with answers that did not pertain to the questions asked of her.  (R. 160).  McAdams was unable to say whether she had grandchildren.  (R. 160).  The examiner diagnosed McAdams with psychosis, NOS and polydrug dependence of Xanax and Soma.  (R. 161).

On the same day, June 15, 2001, an MRI of McAdams' brain was performed, which revealed nonspecific punctate areas of increased signal in the perventricular white matter centrum semiovale, but no other significant findings were noted.  (R. 172, 219, 587).  Another radiology report showed that McAdams' had normal chest findings.  (R. 174, 221).

14

On June 16, 2001, McAdams had a follow-up psychiatric visit from the same physician as on June 15, 2001.  (R. 161).  The examiner noted that McAdams seemed a little calmer, but that she reported to have only slept for one hour during the previous night, and the "sitter" who had been in the room with McAdams reported that she had episodes of being quite agitated.  (R. 161).  The examiner recommended that McAdams continue psychiatric treatment at Cypress Creek Hospital, where she allegedly had been previously admitted and treated by a psychiatrist, "Dr.Ginsberg." (R. 161).

A radiology report dated June 16, 2001, revealed that McAdams has degenerative changes in her right hand, resulting in a diagnosis of osteoarthritis.  The findings were reported as "only moderate" and no fracture, dislocation, or obvious soft tissue swelling was observed.  (R. 173, 220, 588).

On June 19, 2001, McAdams was discharged from Northeast Medical Center Hospital. (R. 154-155, 239-240).   Dr. Brooks' discharge report stated that a recommendation to have McAdams transferred to Cypress Creek Hospital for in-patient psychiatric care had been made to McAdams, but that she refused to go to Cypress Creek Hospital.  (R. 154, 239).  McAdams did, however, agree to out-patient follow-up visits.  (R. 254, 239).  At the time of her discharge, Dr. Brooks noted that McAdams was "stable."  (R. 154, 239).  McAdams' mental status was normal; deep tendon reflexes were intact; motor, sensory, gait and cerebellar tests were intact.  (R. 154, 239). McAdams was discharged on a regular diet, activity as tolerated, and was advised to follow up with her psychiatrist, "Dr. Shoemaker," and to Dr. Bina in two weeks, and to Dr. Brooks in four weeks. (R. 155, 240).

15

On July 12, 2001, an EEG was performed at the Neurophysiology Clinic.  (R. 233). According to the report, no epileptiform discharges were identified, and the hyperventilation and photic stimulation were unremarkable.  (R. 233).

From August 7, 2002 to November 5, 2003, McAdams visited Dr. Brooks approximately ten times.  (R. 196, 197, 198, 199, 200, 201, 202, 203, 204, 205).  McAdams mostly requested a refill for all of her prescriptions during these appointments, but sometimes complained of back pain, trouble sleeping, or chest pain and the inability to keep food down.  (R. 196, 197, 198, 199, 200, 201, 202, 203, 204, 205).

On August 22, 2003, McAdams had an Internal Medicine Consultative Examination with George M. Isaac, M.D. ("Dr. Isaac").  (R. 181-187).  Dr. Isaac noted that McAdams had no difficulty getting along with, or relating to, others, and that she had a few friends with whom she associates.  (R. 181).  Dr. Isaac additionally noted that McAdams lives alone, and is able to take personal care of herself.  (R. 182).  His report stated that McAdams was able to ambulate around his office area without any difficulty or assistance, that her range of joints was normal, but that she was unable to either bend and touch her finger to the floor or squat.  (R. 182-183).  Dr. Isaac concluded by noting that McAdams had chronic low back pain, a history of grand mal seizure which was controlled, a history of hypothyroidism and osteoporosis, a history of depression, and a history of hypertension which was partly controlled.  (R. 183-184).  An x-ray that was requested by Dr. Isaac revealed compression of L2 vertebra.  (R. 185).

McAdams had a Psychological Evaluation by Merrill P. Anderson, Ph.D. ("Dr. Anderson"), on August 26, 2003.  (R. 188-191).  During the examination, McAdams disclosed that her family life was disrupted due to her parents' alleged alcoholism.  (R. 188).  McAdams also denied ever

having a substance dependency problem.  (R. 188).  Dr. Anderson noted that McAdams' depressive symptoms include long term sleep disturbance, reduced appetite, increased frequency of crying, and reduced interest and motivation; noted depressive signs included mild psychomotor retardation, some tearfulness, and some self-deprecating and self-pitying moments.  (R. 189).  Dr. Anderson diagnosed McAdams has having major depression and an anxiety disorder.  (R. 189).  McAdams was evaluated with a global assessment of functioning ("GAF ") rating of 55.[1]  (R. 190).  Dr. Anderson concluded by opining that McAdams could improve if she complied with psychiatric medications.  (R. 190).

On September 8, 2003, State Agency reviewing psychologist M. Chappuis, Ph.D. ("Dr. Chappuis") completed a Psychiatric Review Technique Form of McAdams' alleged affective and anxiety-related disorders.  (R. 456-469).  Dr. Chappuis determined that McAdams only experienced a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, concentration, persistence, or pace, and no episodes of decompensation.  (R. 466).  After reviewing the records, Dr. Chappuis found that McAdams did not meet the disability criteria.  (R. 467).

Additionally, on September 8, 2003, Dr. Chappuis completed a Mental Residual Functional Capacity Assessment of McAdams' alleged affective and anxiety disorders.  (R. 444-447).  Dr. Chappuis determined that McAdams was either "not significantly limited" or "moderately limited" in every category.  (R. 444-445).  Dr. Chappuis noted that McAdams could understand, remember,

---

[1]  A GAF score represents a clinician's judgment of an individual's overall level of functioning.  *See* AMERICAN PSYCHIATRIC ASSOCIATION:  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV-TR") 32 (4th ed. 2000).  The reporting of overall functioning is done by using the GAF scale, which is divided into ten ranges of functioning.  The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range.  A GAF rating of 55 indicates that McAdams has "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficult[y] in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *See id.* at 34.

and carry out detailed, but not complex, instructions; make decisions; attend and concentrate for extended periods; accept instructions; and, respond appropriately to changes within the work setting. (R. 446).  Both of Dr. Chappuis' determinations were reviewed and affirmed.  (R. 446, 456).

On the same date, September 8, 2003, State Agency reviewing physician M. Dolan, M.D. ("Dr. Dolan") completed a Physical Residual Functional Capacity Assessment of McAdams' lower back pain, seizures, and hypertension.  (R. 448-455).  According to Dr. Dolan, McAdams could lift and/or carry 20 pounds occasionally and 10 pounds frequently; could sit, stand, and/or walk (with normal breaks) for about 6 hours in an 8-hour workday; could push and/or pull and unlimited amount, other than as shown for lift and/or carry; and could occasionally stoop and crouch.  (R. 449-450).  No other limitations were found.  (R. 449-452).  Dr. Dolan found that the medical and other evidence partially supported McAdams' limitations based on her impairments, but not to the disabling extent alleged.  (R. 453).  Dr. Dolan's determinations were reviewed and affirmed. (R. 448).

On November 18, 2003, McAdams arrived at Northeast Medical Center Hospital complaining of chest pain.  (R. 303).  The examiner's impression was that McAdams was experiencing bronchitis, among other similar illnesses.  (R. 304).

On December 23, 2003, McAdams was admitted to Northeast Medical Center Hospital due to an overdose of Xanax and Soma.  (R. 276-284).  She was subsequently transferred to Cypress Creek Hospital for detoxification and a chemical dependency therapy.  (R. 372).  When she arrived at Cypress Creek Hospital, McAdams admitted that she had a long history of substance abuse: 20 years of Xanax abuse and 5 years of Soma abuse.  (R. 347).  It was noted in McAdams' Psychiatric Assessment that her family brought her to the emergency room in hopes that she would realize she

needed help with her heavy addiction, after finding her passed out after she consumed an extra large amount of pills. (R. 372). In fact, McAdams stated, "I've got to get help or my family isn't going to have anything to do with me." (R. 344). Among many other symptoms, McAdams claimed she was experiencing sadness, frequent crying, guilt rumination, sleep problems, rapid mood swings, and anxiety attacks. (R. 351).

During her stay at Cypress Creek Hospital, McAdams attended numerous group meetings, appeared active and alert, and experienced a decrease in her anxiety. (R. 317, 319, 322, 323, 325, 326, 360). In fact, McAdams distinctly stated, "I'm glad I decided to come," on December 25, 2003. (R. 362). It was noted that during group sessions, McAdams responded when she was addressed, participated when encouraged to do so, was able to stay for the entire duration of the session, worked independently, and had gross motor impairments. (R. 355). McAdams stayed at Cypress Creek Hospital until December 27, 2003, at which time she was discharged after becoming stabilized and requesting release. (R. 370-371, 392).

On January 8, 2004, McAdams visited Dr. Brooks, alleging that she had found lumps in her breast. (R. 195). On February 11, 2004, McAdams visited River Oaks Imaging and Diagnostic for a mammogram, which revealed a 1.4 cm lump in her right breast. (R. 257, 430, 547, 595-596). On February 16, 2004, McAdams had an ultrasound examination of her right breast, which showed the presence of a hypocchoic nonmobile firm mass. (R. 255, 429, 546). An ultrasound-guided biopsy was performed on February 26, 2004, the results of which revealed that McAdams had grade 2 ductal carcinoma. (R. 251-254, 266, 267, 269, 270-272, 273, 274, 437-439, 440-443, 542-545, 597-600).

On March 4, 2004, McAdams arrived at Northeast Medical Center Hospital complaining of pain in her right breast. (R. 263). The record seems to indicate that McAdams discussed her biopsy results with Dr. Brooks on this date, as well. (R. 193).

The next day, March 5, 2004, McAdams had an evaluation with Norman M. Sorgen, M.D., F.A.C.S. ("Dr. Sorgen") concerning her right breast lumps. (R. 515, 538). A subsequent mammogram and ultrasonography were suspicious for the malignancy of McAdams' breast lump, so Dr. Sorgen suggested a mastectomy. (R. 515, 538).

Several days later, on March 9, 2004, a nuclear medicine bone scan revealed that McAdams had bilateral rib fractures in both rib cages. (R. 260, 428, 534, 552). The right sided fracture was at the 10th rib, and the left sided fractures were at the 5th and 7th ribs. (R. 260, 428, 534, 552). The rib fractures in McAdams' left rib cage were in the stage of healing. (R. 260, 428, 534, 552).

McAdams returned to Dr. Sorgen on March 11, 2004, where they discussed a right partial mastectomy with sentinel lymph node mapping and biopsy. (R.551). The surgery was performed by Dr. Sorgen on March 19, 2004, and after removal of the specimen, it appeared that the lump was successfully excised. (R. 517-518, 524, 604-605).

On March 25, 2004, McAdams met with cardiologist Imtihan M. Jawdat, M.D., F.A.C.P., P.A. ("Dr. Jawdat") at the Houston Heart Clinic, complaining of high blood pressure. (R. 601-602). Dr. Jawdat noted that he had treated McAdams in the hospital and she was visiting him for a follow-up. (R. 601). Upon examination, Dr. Jawdat noted that she was fully oriented and in no acute distress. (R. 602). He observed no edema, clubbing, or cyanosis in her extremities. (R. 602). Dr. Jawdat's impression was hypertension, chronic obstructive pulmonary disease ("COPD"), seizure disorder, right breast cancer, and hyperlipidemia. (R. 602). Dr. Jawdat recommended she begin

20

taking Pravochol daily and continue with her other medications.  (R. 602).  Dr. Jawdat referred McAdams for an echocardiogram and requested that she return for an office visit in one week. (R. 602).  After reviewing the echocardiogram results, Dr. Jawdat's impression was that McAdams had normal left ventricular function and concentric left ventricular hypertrophy.  (R. 613).

On April 28, 2004, after her lumpectomy, McAdams met with Giuseppe Fraschini, M.D. ("Dr. Fraschini) to discuss any additional treatment.  (R. 404-405, 499-500, 616-617).  Upon examination, Dr. Fraschini noted that her extremities, neurological system, and skeletal system were grossly intact.  (R. 405, 500, 617).  At the end of the consultation, McAdams was scheduled to have a port for chemotherapy surgically inserted by Dr. Sorgen.  (R. 405, 500, 617).  Dr. Sorgen inserted the port on April 30, 2004 (R. 493, 498, 529).  On May 10, 2004, McAdams began chemotherapy under the supervision of Dr. Fraschini.  (R. 403).

On May 19, 2004, McAdams was admitted to Northeast Medical Center Hospital, complaining of throbbing-like chest pain in her lower substernal area, fever, and lower back pain. (R. 480-481, 626-627).  Under the care of Dr. Jawdat, McAdams was admitted to the hospital to obtain blood cultures, begin an antibiotic, and consult with hematology and infectious disease. (R. 481, 627).  A CT of McAdams' chest revealed no evidence of pulmonary embolism; no evidence of acute air-space disease; and pericardial effusion or thickening with approximately 1-cm thickness. (R. 618-619).

On May 21, 2004, McAdams had a consultation with Sharafali Diwan, M.D. ("Dr. Diwan"). (R. 482-483, 624-625).  Dr. Diwan reported that McAdams appeared to be responding to the antibiotic and was requesting to be discharged from the hospital.  (R. 482-483, 624-625).  Dr. Diwan noted that McAdams denied any pain and was in no discomfort.  (R. 482, 624).  Dr. Diwan's

assessment was neutropenia and fever in breast cancer patient, status post chemotherapy.  (R. 483, 625).  Dr. Diwan opined that McAdams could be managed at home.  (R. 483, 625).

On May 21, 2004, McAdams was discharged from the hospital.  Dr. Jawdat reported in his discharge notes that McAdams was feeling well and requested discharge.  (R. 478-479, 622-623). He further reported that McAdams was in no pain.  (R. 478, 622).  Dr. Jawdat recommended that she continue the antibiotic at home as well as Trazadone, Klonopin, and Effexor, and return to a follow-up visit in one week.  (R. 479, 623).  Dr. Jawdat further recommended her diet and activity level "as tolerated."  (R. 479, 623).

On June 2, 2004, McAdams had an evaluation with Dr. Fraschini after her first cycle of chemotherapy, who noted that she did well for the first couple of days after chemotherapy, but then began experiencing some persistent nausea.  (R. 566).  He also noted that McAdams was alopecic, anemic, and normocephalic.  (R. 566).  On June 23, 2004, McAdams had another evaluation appointment with Dr. Fraschini, who noted that McAdams was tolerating the chemotherapy well, despite a small amount of fatigue.  (R. 565).  McAdams attended several other evaluation appointments, where everything was noted to be mostly fine.  (R. 561, 562, 563, 564).  At her last appointment with Dr. Fraschini, after McAdams' six cycles of chemotherapy were complete, he referred her to Dr. Sorgen in order to have the port removed, and recommended she receive radiation therapy.  (R. 561).

On July 26, 2004, McAdams visited Dr. Bina, complaining of seizures.  (R. 582-585).  Dr. Bina noted that she had last seen McAdams in August 2001, and that McAdams had been getting her seizure medication from Dr. Brooks.  (R. 582).  McAdams reported that her last major seizure was approximately 1 ½ months earlier.  (R. 582).  At the time of her visit, McAdams related a

multitude of problems: chronic fever, swollen glands, nose bleeds, weight loss; neck, back, joint, and muscle pain; loss of appetite; thyroid problems; dizziness and seizure disorder.  (R. 582, 584).

Upon examination, Dr. Bina reported that McAdams was alert and cooperative, and did not appear acutely or chronically ill.  (R. 582).  McAdams' mental status exam revealed that she was oriented to time, place and person.  (R. 583).  Historical events were related in a coherent, organized manner, and there was a normal fund of general information.  (R. 583).  Dr. Bina reported that there was no evidence of any weakness in any muscular group.  (R. 583).  Also, there was no atrophy or fasciculations, and there was no tone change.  (R. 583).  Dr. Bina further noted that sensory testing to modalities of pain, position, and vibration showed no evidence of loss.  (R. 583).  There were no areas of hyperpathia or focalized tenderness.  (R. 583).  Dr. Bina reported that McAdams had normal station and gait; McAdams was able to perform rapid alternating movement bilaterally without difficulty.  (R. 583).  Dr. Bina's impression was epilepsy, generalized tonic clonic, started in 1980s as well as right breast cancer, negative lymphanodes.  (R. 583).  Dr. Bina advised McAdams of the importance of taking anti-seizure medication correctly as well as scheduling regular follow-up appointments and blood work to control the seizures.  (R. 583).  Dr. Bina continued her anti-seizure medication, ordered blood work, an MRI, and an electroencephalogram (EEG).  (R. 583).

On August 17, 2004, McAdams met with Dr. Bina for a follow-up appointment.  (R. 577).  Dr. Bina reviewed the results of the blood work, EEG, and MRI.  (R. 573-579).  Dr. Bina's impression of McAdams' blood work was  that her phenytoin was low.  (R. 573, 575).  McAdams' EEG was essentially normal except minimal drsrythmias.  (R. 576).  An MRI of McAdams' brain was normal.  (R. 580).

By September 24, 2004, McAdams received the last of twenty-six chemotherapy sessions. (R. 567-571).  On October 6, 2004, McAdams discussed the removal of the port with Dr. Sorgen, and the port was subsequently removed on October 12, 2004.  (R. 471, 474-476).

On December 25, 2004, McAdams visited the emergency room at Northeast Medical Center Hospital, complaining of a "stabbing" pain in her ribs and pain in her lower back.  (R. 635, 638-644).  X-rays were taken of McAdams' chest and lumbosacral spine.  (R. 652).  McAdams' chest x-ray was noted as unremarkable.  (R. 652).  Upon review of McAdams' lumbosacral spine x-ray, it was reported that the lumbar segments were normally aligned.  There was mild compression deformity of the L-2 vertebral body with approximately 30% loss of height.  The other lumbar segments and the lumbar disc spaces appeared well maintained.  There was mild narrowing at the L1-2 disc level. (R. 652).  The impression was reported as "[c]hronic, minor compression deformity of the L2 vertebral body.  (R. 652).  Although the record is illegible, it appears that McAdams was released from the emergency room with a prescription for narcotic pain medication.  (R. 646-648).

"[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  The opinion of a specialist generally is accorded greater weight *than* that of a non-specialist.  *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S. 103, 108 (2000).  Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings.  *See Scott*, 770 F.2d at 485.  Moreover, a treating physician's opinions are far from conclusive and may be assigned

little or no weight when good cause is shown.  *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237.  Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.  *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456; *see also Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211.  It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status. *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

**(a).**      ***Severe Impairments: Back Pain, Depression, and Seizure Disorder***

Although diagnostic studies of McAdams' lumbar spine reveal an old, mild compression fracture at T1-2 disc level, as well as a compression fracture at her L2 disc level, numerous doctors, over the course of several years, have reported a lack of neurological deficits.  For example, in 2001, Drs. O'CONNOR and Brooks reported the McAdams demonstrated full strength in all four of her extremities and showed symmetric deep tendon reflexes, intact sensation, and cranial nerves, and an unremarkable gait.  (R. 151-152).  Similarly, in 2003, Dr. Isaacs noted that McAdams was able to walk in the office and sit and stand from a chair without difficulty and that she exhibited no motor deficits, muscle spasms or muscle atrophy from disuse.  (R. 182-183).  McAdams' sensory and extremity functioning, coordination, and range of motion in all her joints were all normal and she had full muscle strength.  (R. 183).  Also, in late 2003, it was reported by an emergency room physician that McAdams' range of motion was normal and she demonstrated no motor or sensory deficits.  (R. 304).

In 2004, Dr. Bina reported that McAdams showed no evidence of muscle weakness, atrophy, or tone change, and that her deep tendon reflexes were active and symmetrical.  (R. 583). Additionally, Dr. Bina noted that sensory testing to modalities of pain, position, and vibration yielded no evidence of loss, that McAdams demonstrated normal gait and station, and that she was able to perform rapid, alternating movements bilaterally without difficulty.  (R. 583).  Taking all of the evidence into consideration, there is substantial evidence to support the ALJ's decision that McAdams' alleged back pain is not disabling.

Likewise, the record does not support McAdams' contention of disabling depression.  In June 2001, Dr. O'Connor noted that McAdams was able to follow commands with good comprehension and showed intact memory.  In August 2003, Dr. Isaac opined that McAdams' general mental status was unremarkable.  (R. 150-152, 184).  Also, in August 2003, Dr. Anderson reported that McAdams showed coherent mentation, adequate insight, intact remote memory and fair recent memory. (R. 189).  In December 2003, Dr. Skiba noted that McAdams' thought processes were logical, here recent and remote memory were adequate, and her insight and judgment were fair.  (R. 374). Because the record evidence reflects that McAdams displayed only slight, if any, limitations in her ability to remember, follow commands, understand, and use judgment, the ALJ correctly determined that McAdams does not suffer from disabling depression.

Finally, McAdams' seizure disorder does not meet the level of a listing.  For example, there is a presumption of disability when a claimant has convulsive epilepsy (grand mal or psychomotor) if it is "documented by detailed description of seizure pattern, including all associated phenomenon; occurring more frequently than once a month *in spite of at least 3 months of prescribed treatment*." along with "daytime episodes (loss of consciousness and convulsive seizures)" or "nocturnal

episodes manifesting residuals which interfere significantly with activity during the day."  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02 (emphasis added); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.03 (relating to nonconvulsive epilepsy).  Based on the medical records, McAdams' seizures appeared under control when she took her medication (*i.e.*, Dilantin).  McAdams, however, failed to regularly take her medication and failed to seek regular follow-up treatment with her neurologist, Dr. Bina.  (R. 158, 583).  "Medical impairments that reasonably can be remedied or controlled by medication or treatment are not disabling."  *Glenn v. Barnhart*, 124 Fed. Appx. 828, 829 (5th Cir. 2005) (citing *Johnson v. Bowen*, 864 F.2d 340, 347 (5th Cir. 1988); *Fraga v. Bowen*, 810 F.2d 1296, 1303-04 (5th Cir. 1987); *Adams v. Bowen*, 833 F.2d 509, 511-12 (5th Cir. 1987)).

In any event, the medical records do not indicate that McAdams suffered from a seizure "pattern" more than once a month.  In once instance, both Drs. Brooks and Bina opined in their diagnoses that McAdams' seizure disorder could possibly due to abuse of medications or possibly withdrawal to medications.  (R. 156, 158).  Moreover, Dr. Isaac described McAdams' seizure disorder as "controlled."  (R. 184).  In sum, there is substantial evidence in the record to support the ALJ's decision that McAdams' seizure disorder did not rise to the level of a disabling impairment.

### (b). <u>*Non-Severe Impairments of Breast Cancer, High Blood Pressure, Thyroid*</u>

Although the Commissioner concedes that the record lacks evidence that McAdams' breast cancer was cured prior to expiration of twelve months, it is McAdams' burden to prove that she suffers from a disability that lasted for at least twelve months.  *See Cook*, 750 F.2d at 393.  Here, McAdams failed to present evidence that her breast cancer met the duration requirement.  Instead, as noted by the ALJ, there was no evidence in the record to demonstrate that she had signs of recurring breast cancer.  (R. 28-29).  Dr. Fraschini indicated that McAdams' T1cNOMO breast

cancer, infiltrating ductal carcinoma was negative in a consultative report on April 28, 2004. (R. 499-500). Thus, to the extent McAdams argues that the ALJ erred in finding her breast cancer to be a non-severe impairment, her argument lacks merit.

Similarly, the ALJ properly determined that McAdams' hypertension and thyroid disease were non-severe impairments. The record evidence indicates that both her high blood pressure was controlled as well as her thyroid disease. (R. 29, 197, 199). As such, substantial evidence supports the ALJ's determination.

To the extent, McAdams also argues that she suffers limitations due to osteoarthritis in her hands, the record is devoid of evidence supporting this assertion. Indeed, as set forth above, Dr. Isaacs noted in August 2003, that McAdams displayed full muscle strength in all of her extremities and that she was able to pick up small objects with her fingers and button her clothes. (R. 183). Additionally, Dr. Isaacs reported that McAdams' hand grip and grasps were normal and that her strength in both her hands was good. (R. 183). In July 2004, Dr. Bina reported that McAdams had no weakness in any of her muscle groups. (R. 583). Consequently, contrary to McAdams' contention, substantial evidence supports the ALJ's decision.

In sum, based on the objective medical evidence, there is substantial evidence in record to support the ALJ's determination that McAdams suffered from impairments which did not meet or equal the requirements of a listing.

### 2.   *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints. *See Falco*, 27 F.3d at 163 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)). When a plaintiff alleges disability resulting from pain, she must establish a medically

determinable impairment that is capable of producing disabling pain.  *See Ripley*, 67 F.3d at 556

(citing 20 C.F.R. § 404.1529).  Once a medical impairment is established, the subjective complaints

of pain must be considered along with the medical evidence in determining the individual's work

capacity.  *See id.*

It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are

entitled to deference.  *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v.

Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128.  The Fifth

Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the

opportunity to observe the claimant first-hand.  *See Falco*, 27 F.3d at 164 n.18.  Moreover, "[t]he

Act, regulations and case law mandate that the Secretary require that subjective complaints be

corroborated, at least in part, by objective medical findings."  *Harrell v. Bowen*, 862 F.2d 471, 481

(5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d

1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895

F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does

not mandate a finding of disability.  *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267,

1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986).  Additionally,

the mere existence of pain does not automatically bring a finding of disability.  *Harper v. Sullivan*,

887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281.  It must be determined whether

substantial evidence indicates an applicant can work despite being in pain or discomfort.  *See

Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128. The decision arising from the ALJ's discretion to determine whether pain is disabling is entitled to considerable deference. *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at 128; *James*, 793 F.2d at 706. However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record. *See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

The ALJ's decision indicates that the ALJ did consider objective and subjective indicators related to the severity of McAdams' complaints:

> The Administrative Law Judge has taken into consideration the claimant's testimony and allegations of symptoms and limitations. The issue raised by the claimant's allegation is not the existence of pain but rather the degree of pain or other subjective symptom's which the claimant experiences. The objective clinical findings (although not the only factor to be considered) do not support the degree of pain and functional limitation's which the claimant alleges.
>
> * * *
>
> Careful consideration was given to the nature, location, onset, duration, frequency, radiation and intensity of any subjective symptoms or pain experienced by the claimant; as well as any precipitation and aggravating factors such as movement, activity, and environmental conditions.
>
> * * *
>
> While the claimant testified that she suffered from significant pain, she did not testify to taking an inordinate amount of pain medication.
>
> * * *
>
> Although the claimant has described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's activities are truly as limited as alleged, it is difficult to attribute that

30

degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision.  Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

* * *

The undersigned finds that although the claimant may experience some back pain, her complaints of excruciating pain at all levels of activity were not fully credible.

(R. 30-33, 115-134, 695-699, 703-706 ).  Based on a review of the entire record, the Court does not doubt that McAdams suffers from pain; however, the medical records do not support a finding that McAdams' pain is constant, unremitting, and wholly unresponsive to therapeutic treatment.  *See Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.  Instead, and the ALJ noted, McAdams has received treatment for allegedly disabling impairments that has essentially been routine and/or conservative. As set forth above, McAdams has not shown neurological deficits, such as deficiencies in motor and sensory functioning, muscle atrophy, clubbing, edema, muscle weakness, tone change, abnormal gait or deep tendon reflexes, etc. (R. 151-152, 182-183, 304, 583). McAdams' absence of symptoms which highly correlate with pain and functional limitations, undermine McAdams' claim for disability due to pain.

Accordingly, there is substantial evidence that supports the conclusions of the Commissioner and the ALJ that McAdams' subjective reports of pain do not rise to the level of disability.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown*, 192 F.3d at 496.

3.   *Residual Functional Capacity*

Under the Act, a person is considered disabled:

> only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  If a claimant demonstrates that she cannot perform her past relevant work, the Commissioner bears the burden of proving that her functional capacity, age, education, and work experience allow her to perform work in the national economy.  *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236.  Once the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that she cannot perform the alternate work suggested.  *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey*, 230 F.3d at 135.

To determine whether an applicant can return to a former job or, if never employed, can perform substantial work in the national economy, the regulations require the ALJ to evaluate the applicant's residual functional capacity ("RFC").  *See Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983) (citing 20 C.F.R. §§ 404.1561, 416.961).  This term of art merely designates the ability to work despite physical or mental impairments.  *See id.*; *see also* 20 C.F.R. §§ 404.1545, 416.945.  "Residual functional capacity" combines a medical assessment with the descriptions by physicians, the applicant or others of any limitations on the applicant's ability to work.  *See id.*  When a claimant's RFC is not sufficient to permit her to continue her former work, then her age, education, and work experience must be considered in evaluating whether she is capable of performing any

other work.  *See* 20 C.F.R. §§ 404.1561, 416.961.  The testimony of a vocational expert is valuable

in this regard, as "[she] is familiar with the specific requirements of a particular occupation,

including working conditions and the attributes and skills needed." *Carey*, 230 F.3d at 145; *see also*

*Masterson*, 309 F.3d at 273; *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995); *Fields v. Bowen*,

805 F.2d 1168, 1170 (5th Cir. 1986).  In the absence of contrary evidence, the ALJ may properly

rely on the testimony of a vocational expert in reaching a conclusion regarding a claimant's RFC

to perform work available in the national economy.  *See Masterson*, 309 F.3d at 273.

Moreover, under certain circumstances, the ALJ's application of the medical-vocational

guidelines set forth in Appendix 2 of Subpart P of the regulations, also referred to as the grids,

without testimony from a vocational expert, is sufficient to assess whether a claimant is able to work

or is disabled under the Act.  *See Heckler v. Campbell*, 461 U.S. 458, 467, 470 (1983).  As the

Supreme Court explained in *Campbell*:

> These guidelines relieve the Secretary of the need to rely on vocational experts by
> establishing through rulemaking the types and numbers of jobs that exist in the
> national economy.  They consist of a matrix of the four factors identified by
> Congress–physical ability, age, education, and work experience–and set forth rules
> that identify whether jobs requiring specific combinations of these factors exist in
> significant numbers in the national economy.  Where a claimant's qualifications
> correspond to the job requirements identified by a rule, the guidelines direct a
> conclusion as to whether work exists that the claimant could perform.  If such work
> exists, the claimant is not considered disabled.

461 U.S. at 461-62 (footnotes omitted).  The Court elaborated:

> Each of these four factors is divided into defined categories. A person's ability to
> perform physical tasks, for example, is categorized according to the physical exertion
> requirements necessary to perform varying classes of jobs—*i.e.*, whether a claimant
> can perform sedentary, light, medium, heavy, or very heavy work.  20 C.F.R.
> § 404.1567.  Each of these work categories is defined in terms of the physical
> demands it places on a worker, such as the weight of objects [she] must lift and
> whether extensive movement or use of arm and leg controls is required. *Ibid.*

*Id.* at 462 n.3.

Under the regulations, impairments can be either exertional or nonexertional.  *See Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000).  Impairments are classified as exertional if they affect the claimant's ability to meet the strength demands of jobs.  *Id.*  The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertional levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling.  *See id.*; *see also* 20 C.F.R. § 404.1569(a).  All other impairments are classified as nonexertional.  *See Sykes*, 228 F.3d at 263.

In evaluating RFC, the Fifth Circuit has looked to SSA rulings ("SSR").  The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance.  *See Myers*, 238 F.3d at 620 (citing *B.B. ex rel. A.L.B. v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir. 1981)).  In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and the interplay of exertional and nonexertional factors:

> First, SSR 96-8p provides that a residual functional capacity (RFC) "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities."  "However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . ."  RFC involves both exertional and nonexertional factors.  Exertional capacity involves seven strength demands:  sitting, standing, walking, lifting, carrying, pushing, and pulling.  "Each function must be considered separately."  "In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (quoting 61 Fed. Reg. 34474-01 (July 2, 1996)).  The court also noted that SSR 96-9p defines exertional capacity as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated.  *See id.*  Thus, to determine that an applicant can do a given type of work, the ALJ must find that the applicant can meet the job's exertional and nonexertional requirements on a sustained basis and can maintain regular employment.  *See Watson*, 288 F.3d at 218; *Singletary v. Bowen*, 798 F.2d 818, 821 (5th Cir. 1986); *Carter*, 712 F.2d at 142 (citing *Dubose v. Mathews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

When a claimant suffers only exertional impairments and an ALJ's findings of residual functional capacity, age, education, and previous work experience coincide with the grids, the Commissioner may rely exclusively on the medical-vocational guidelines to determine whether work exists in the national economy which the claimant can perform.  *See Newton*, 209 F.3d at 458 (citing *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987); 20 C.F.R. § 404.1569(b)).  Nevertheless, "use of the grid rules is only appropriate 'when it is established that the claimant suffers only from exertional impairments, or that the claimant's nonexertional impairments do not significantly affect [her] residual functional capacity.'"  *Watson*, 288 F.3d at 216 (quoting *Crowley*, 197 F.3d at 199); *accord Loza v. Apfel*, 219 F.3d 378, 398 (5th Cir. 2000); *Newton*, 209 F.3d at 458.  If the claimant suffers from nonexertional impairments or a combination of exertional and nonexertional impairments, then the Commissioner must rely on a vocational expert to establish that suitable jobs exist in the economy.  *See id.*  Therefore, before applying the grids, it must be determined whether nonexertional factors, such as mental illness, significantly affect a claimant's RFC.  *See Loza*, 219 F.3d at 399; *Newton*, 209 F.3d at 459.

Here, McAdams suffers from exertional and nonexertional impairments (*i.e.*, mental impairments); thus, it was proper for the ALJ to rely on a vocational expert to establish that suitable jobs exist in the economy. *See Watson*, 288 F.3d at 216 (quoting *Crowley*, 197 F.3d at 199); *accord Loza*, 219 F.3d at 398; *Newton*, 209 F.3d at 458. In determining McAdams' residual functional capacity, the ALJ stated:

> Accordingly, the undersigned finds the claimant retains the residual functional capacity to perform a range of light work. Specifically, the undersigned finds that the claimant can occasionally climb, balance, stoop, kneel, crouch, or crawl. She cannot perform jobs at unprotected heights or in the presence of hazardous machinery or equipment. In addressing the claimant's mental impairment, she must not perform jobs that require detailed work, none requiring sustained concentration and attention or persistence and pace for prolonged periods and, she can only have occasional interaction with the general public.

(R. 33, 35, 710-713). Because the VE classified McAdams' past relevant work as a care giver (medium to heavy, unskilled), a cook (medium, skilled), and a cashier (light, unskilled), the ALJ determined that she could not perform her past relevant work. (R.33, 710). Based on the VE testimony, the ALJ then concluded that McAdams' functional limitations did not prevent her from performing a significant number of jobs in the national or regional economy, such as work as a bench assembler, a garment sorter, and a plumbing hardware assembler. (R. 34, 711).

Here, McAdams argues that the ALJ erred in developing McAdams' RFC. As set forth above, McAdams' alleged limitations are belied by the medical records. The objective clinical findings simply do not support the degree of limitations alleged by McAdams. Because the ALJ's hypothetical questions to the VE included all of the physical and mental limitations supported by the record, the VE's testimony is substantial evidence of a significant number of jobs McAdams can perform. *See Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). As such, there is sufficient evidence to support the ALJ's finding that McAdams has the mental and physical functional

36

capacity to perform light work, with the limitations set forth above.  The ALJ's RFC sufficiently compensated for all of McAdams' limitations.

Next, McAdams argues that the ALJ erred in failing to make a specific finding as to whether McAdams can sustain employment.  *See* Docket Entry No. 19, at 9, 13.  Contrary to McAdams' contention, this specific finding is not required by law.  *See Perez v. Barnhart*, 415 F.3d 457, 464-65 (5th Cir. 2005); *Dunbar v. Barnhart*, 330 F.3d 670, 671 (5th Cir. 2003); *Frank v. Barnhart*, 326 F.3d 628, 620 (5th Cir. 2003); *Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002).  In this regard, the Fifth Circuit has stated that "nothing in *Watson* suggests that the ALJ must make a separate and explicit finding regarding the claimant's ability to maintain employment in every case."  *Frank*, 326 F.3d at 620.  The Fifth Circuit further explained:

> . . . *Watson* required the ALJ to make a finding as to the claimant's ability to maintain a job for a significant period of time, notwithstanding the exertional, as opposed to non-exertional (*e.g.*, mental illness) nature of the claimant's alleged disability.  *Watson* requires a situation in which, by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms.  For example, if Frank had alleged that her degenerative disc disease prevented her from maintaining employment because every number of weeks she lost movement in her legs, this would be relevant to the disability determination.  At bottom, *Watson* holds that in order to support a finding of disability, the claimant's intermittently recurring symptoms must be of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time.  An ALJ may explore this factual predicate in connection with the claimant's physical diagnosis as well as in the ability-to-work determination.  Usually, the issue of whether the claimant can maintain employment for a significant period of time will be subsumed in the analysis regarding the claimant's ability to obtain employment.  Nevertheless, an occasion may arise, as in *Watson*, where the medical impairment, and the symptoms thereof, is of such a nature that separate consideration of whether the claimant is capable of maintaining employment is required.  Frank did not establish the factual predicate required by *Watson* to necessitate a separate finding in this regard.

*Frank*, 326 F.3d at 619-20.  The Fifth Circuit also has noted that subsumed within the definition of RFC is the understanding that the claimant can maintain work at the level of the RFC.  *See Dunbar*, 330 F.3d at 671.

Here, McAdams' case does not present circumstances under which the ALJ is required to make a separate finding that McAdams is able to maintain employment over a significant period of time.  Thus, contrary to McAdams' assertion, it appears that her ability to maintain employment was adequately taken into account by the ALJ's RFC determination.  As such, taken as a whole, there is sufficient evidence in the record including expert testimony to show that the ALJ properly assessed McAdams' residual functional capacity

**III.**     *Conclusion*

In sum, the record provides substantial evidence supporting the Commissioner's decision that McAdams is not disabled.  Accordingly, it is therefore

**ORDERED** that McAdams' Motion for Summary Judgment (Docket Entry No. 19) is **DENIED**.  It is further

**ORDERED** that the Commissioner's Motion for Summary Judgment (Docket Entry No. 20) is **GRANTED**.  Finally, it is

**ORDERED** that the Commissioner's decision is **AFFIRMED**.

**SIGNED** at Houston, Texas on this 31st day of March, 2008.

Calvin Botley
United States Magistrate Judge

38